**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| DWAYNE HATCHER, | ) | CASE NO. 1:18CV1123 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Dwayne Hatcher ("Plaintiff" or "Hatcher"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his application for a Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.*

("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the

parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's

final decision is AFFIRMED.[2]

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2] On December 26, 2018, this matter was stayed due to the lapse of congressional
appropriations funding the federal government. *See* General Order 2018-15. The stay
was thereafter extended pursuant to General Order 2019-1. As the government shutdown
has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

1

# I.   PROCEDURAL HISTORY

In August 2015, Hatcher filed an application for POD and DIB, alleging a disability onset date of April 30, 2015 and claiming he was disabled due to left shoulder weakness, left hip pain/arthritis, disfigured left foot, sprained knee, and right ankle weakness.  (Transcript ("Tr.") at 13, 286, 331.)  The applications were denied initially and upon reconsideration, and Hatcher requested a hearing before an administrative law judge ("ALJ").  (Tr. 13.)

On April 21, 2017, an ALJ held a hearing, during which Hatcher, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 116-162.)  On August 30, 2017, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 13-29.)  The ALJ's decision became final on March 28, 2018, when the Appeals Council declined further review.  (Tr. 1-4.)

On May 15, 2018, Hatcher filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16.)  Hatcher asserts the following assignment of error:

> (1)    Whether the ALJ's finding, that Mr. Hatcher is capable of performing past relevant work as a tax preparer, is supported by substantial evidence when the ALJ's residual functional capacity finding failed to take into account Mr. Hatcher's credible complaints of pain.

(Doc. No. 14.)

# II.   EVIDENCE

## A.    Personal and Vocational Evidence

Hatcher was born in November 1961 and was fifty-five (55) years-old at the time of his administrative hearing, making him a "person of advanced age" under social security regulations.  (Tr. 286.)  *See* 20 C.F.R. §§ 404.1563(e) & 416.963(e).  He has a high school

education and two years of college, and is able to communicate in English.  (Tr. 332.)  He has

past relevant work as a tax preparer.  (Tr. 22.)

**B.** **Relevant Medical Evidence**[3]

The record reflects Hatcher established care with primary care physician Todd Wagner,

M.D., on July 20, 2012.  (Tr. 455-456.)  He reported a history of alcohol and cocaine

dependence, but indicated he had been sober for 9 months.  (*Id*.)  Physical examination findings

were normal.  (*Id*.)  Dr. Wagner diagnosed hypertension and obesity, prescribed blood pressure

medication, and ordered blood work.  (*Id*.)

Hatcher returned to Dr. Wagner on August 17, 2012.  (Tr. 451-452.)  He reported a

history of musculoskeletal injuries to his right knee, right ankle, and left foot, "resulting in

polyarthralgia at times and resultant bilateral hip pain."  (*Id*.)  Dr. Wagner noted Hatcher walked

with a cane for assistance.  (*Id*.)  Dr. Wagner assessed polarthropia likely due to osteoarthritis

and advised Hatcher to take ibuprofen as needed.  (*Id*.)  Several months later, on December 8,

2012, Hatcher complained of painful ambulation due to callouses on his feet.  (Tr. 445.)  Dr.

Wagner referred Hatcher to podiatry.  (*Id*.)

Hatcher returned to Dr. Wagner on September 11, 2013.  (Tr. 434-435.)  He indicated he

had relapsed on his sobriety and had "multiple DUIs."  (*Id*.)  Hatcher reported he had received

outpatient treatment and was now attending AA meetings.  (*Id*.)  Physical examination findings

were normal, including grossly intact strength, sensation, and coordination.  (*Id*.)  Over a year

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is
limited to the evidence cited in the parties' Briefs.

later, on September 23, 2014, Hatcher presented to Dr. Wagner with complaints of callouses on his feet. (Tr. 404.) Dr. Wagner referred him to podiatry. (*Id.*)

On March 12, 2015, Hatcher presented to podiatrist Angela Grady, DPM. (Tr. 393-394.) He reported the following symptoms:

> Patient presents to clinic because his feet are bad news. States he has a misplaced bone in his left arch. States he broke that foot over 30 years ago and it healed that way. States it gives him occasional pain for a long time. States he also broke his right ankle. States he has a big callus on the bottom of his right foot that he can't get rid of. He has pain with walking. * * * He takes naprosyn for his pain. He denies diabetes. He smokes 1/2 ppd. No other pedal complaints at this time.

(Tr. 393.) On examination of Hatcher's feet and ankles, Dr. Grady noted 5/5 muscle strength and normal range of motion with no crepitus. (Tr. 394.) She assessed painful hyperkeratoses, onychomychosis, and prominence in left medial/plantar arch. (*Id.*) Dr. Grady also ordered an x-ray of Hatcher's left foot, which he underwent that day. (*Id.*) The x-ray showed multiple midfoot fracture deformities, and "severe *pes planus*." (Tr. 395-396.)

Shortly thereafter, Hatcher returned to Dr. Wagner. (Tr. 425-426.) Dr. Wagner prescribed a trial of Naproxen and suggested Hatcher might benefit from a custom orthotic. (*Id.*)

Hatcher returned to Dr. Grady on May 7, 2015. (Tr. 392-393.) Examination findings were the same as his previous visit. (*Id.*) Dr. Grady referred him to orthopedics to discuss surgical options. (*Id.*) Hatcher thereafter presented to orthopedist John Feighan, M.D. (Tr. 392.) On examination, Dr. Feighan noted good strength "in all four planes," good pulses, and intact sensation. (*Id.*) He also found tenderness and *pes planus*, and noted Hatcher was using a cane. (*Id.*) Dr. Feighan assessed left midfoot osteoarthritis/deformity, and "discussed possible midfoot osteotomy and fusion in the future once [Hatcher] stops smoking." (*Id.*)

On June 10, 2015, Hatcher returned to Dr. Wagner with complaints of left hip pain. (Tr. 423.) He indicated the Naproxen "help[ed] with the pain." (*Id.*) Dr. Wagner raised the possibility of injections, but Hatcher declined. (*Id.*) Dr. Wagner advised Hatcher to follow up with podiatry and orthopedics as scheduled. (*Id.*)

On September 14, 2015, Dr. Wagner referred Hatcher for an x-ray of his left hip. (Tr. 420-421.) Hatcher underwent the x-ray on October 13, 2015, which showed severe degenerative change of the left hip with joint space narrowing, sclerosis, and osteophytosis. (Tr. 544.)

Hatcher returned to Dr. Wagner on October 14, 2015. (Tr. 418-419.) Dr. Wagner reviewed the x-ray of Hatcher's hip, and noted severe osteoarthritis with "persistent limitation in function." (*Id.*) He continued Hatcher on his medication, and prescribed a hip injection. (*Id.*) Hatcher underwent the injection on October 21, 2015. (Tr. 545.)

On November 5, 2015, Hatcher reported he had received relief from the injection for 3 to 4 days and was able to ambulate without the need for a cane during that time period. (Tr. 416.) However, the "pain resumed" and Hatcher requested increased pain medication. (*Id.*) Hatcher also indicated he was deferring foot surgery until the following spring. (*Id.*) Dr. Wagner found Hatcher had a "poor response to intra-articular steroid injection," and started him on a trial of Diclofenac. (*Id.*)

On December 31, 2015, Hatcher presented to the emergency room with complaints of abdominal pain and blood in his urine. (Tr. 558-563.) Examination revealed mild bilateral tenderness in his right and left lower abdomen, but was otherwise normal. (Tr. 561.) A CT of Hatcher's abdomen and pelvis showed two lesions in his left kidney, and multilevel discogenic degenerative changes of his thoracolumbar spine with partial sacralization of the L5 vertebral

body.  (Tr. 546-547.)  Hatcher was diagnosed with hematuria and lesions in the left kidney; given Tramadol for pain control; and discharged with instructions to follow up with urology. (Tr. 561.)

On February 24, 2016, Hatcher presented to Dr. Wagner with complaints of continued persistent left hip pain despite medication.  (Tr. 411-412.)   Dr. Wagner switched Hatcher's medication (prescribing Meloxicam in place of Diclofenac) and encouraged Hatcher to quit smoking in order to "improve his status as a surgical candidate."  (*Id.*)  Hatcher declined a referral for another hip injection.  (*Id.*)

Over a year later, on March 14, 2017, Hatcher underwent a left hip injection.  (Tr. 552.) The following month, Dr. Wagner authored a letter regarding Hatcher's "current health status and level of impairment."  (Tr. 554-555.)  Dr. Wagner indicated Hatcher had a past medical history of osteoarthritis of the left hip and lumbar spine, traumatic arthropathy of the left foot, obesity, hyperlipidemia, and prediabetes.  (*Id.*)  He recounted the results of previous imaging studies of Hatcher's hip, foot and spine, and stated as follows:

> Mr. Hatcher has demonstrated an inability to ambulate effectively secondary to pain from his osteoarthritis (multiple sites) and traumatic arthropathy of left foot.  This has persisted greater than 12 months and is expected to remain permanent with future intermittent exacerbations.  Mr. Hatcher requires the assistance of a cane.  His current level of impairment limits his ability to maintain his individual [activities of daily living].
>
> * * *
> On exam, Mr. Hatcher has demonstrated a persistent antalgic gait.  He has restricted range of motion in his lumbar spine, left hip, and left foot.  There is generalized weakness of the left lower extremity (4/5) compared to right lower extremity.  Mr. Hatcher has participated in physical therapy and repeat intra-articular injections with limited improvement.  To date, Mr. Hatcher has maintained all recommended interventions and follow up plans.

(*Id.*)  On May 11, 2017, Dr. Wagner prescribed Hatcher a cane.  (Tr. 556.)

On May 22, 2017, Hatcher returned to orthopedist Dr. Feighan for evaluation of his left foot pain. (Tr. 584-585.) Hatcher reported he had quit smoking at Christmas, and that his "foot pain [was] better with change in shoewear to softer cushioned arches." (*Id.*) Examination was normal with "good strength in all four planes," good pulses, and intact sensation. (*Id.*) A left foot x-ray taken that date showed (1) evidence of mild degenerative changes involving the first metatarsophalangeal joint; (2) considerable degenerative disease of first through third tarsometatarsalis; and (3) evidence of midfoot deformity. (Tr. 585.) Dr. Feighan discussed possible foot surgery with Hatcher, but indicated he was "not sure [Hatcher's symptoms are] painful enough yet, though he will push himself and see how his foot feels." (Tr. 584.)

On June 6, 2017, Hatcher presented to George Ochenjele, M.D., for evaluation of his left hip pain. (Tr. 572-575.) He rated his pain an 8 on a scale of 10, and stated it was exacerbated by standing or walking. (Tr. 572.) Examination revealed a moderate antalgic limp on the left side and reduced range of motion in Hatcher's hip, but no tenderness to palpation of his hip, knee or thigh. (Tr. 574.) Neurovascular examination of Hatcher's leg (including motor and sensory exam) was normal. (*Id.*) A hip x-ray taken that date showed (1) advanced left osteoarthritis with joint space narrowing, subchondral sclerosis, and osteophytosis, worsened since prior study; (2) mild osteoarthritis of the right hip; (3) discogenic degenerative disease of the lower lumbar spine; and (4) a "transitional morphology of L5 on the left which demonstrates partial sacralization." (Tr. 581.) A pelvic x-ray from that same date also showed severe osteoarthritis of the left hip, and mild osteoarthritis of the right hip. (Tr. 579.)

Dr. Ochenjele assessed primary osteoarthritis of the left hip. (Tr. 574.) He noted that "nonoperative treatment for [Hatcher's] hip problem including NSAIDs, tylenol or other

analgesics, activity modification and activity restriction and use of assistive devices and hip injections . . . have not provided the patient with durable relief of [his] symptoms." (*Id.*) Dr. Ochenjele indicated Hatcher was not an appropriate candidate for physical therapy, and recommended hip replacement surgery. (*Id.*)

## C. State Agency Reports

On December 6, 2013, in connection with a previous disability application, Hatcher underwent a consultative examination with psychologist Michael Faust, Ph.D. (Tr. 523-530.) He reported chronic pain in his lower back, knees, feet, shoulder and hip. (Tr. 525.) Hatcher also complained of "some depression" and stress due to financial stressors, although he denied symptoms of clinical anxiety, panic attacks, or other mood disturbance. (*Id.*) He acknowledged a long criminal history and a history of substance abuse issues, but stated he had been sober since April 2013. (Tr. 525-526.) With regard to his daily activities, Hatcher stated he attended three to four AA meetings per week, attended church, spent time with family, and played pool, cards, and dominoes for entertainment. (Tr. 528.)

On examination, Dr. Faust noted Hatcher "ambulated with the use of a cane and showed problems with gait in that he limps." (Tr. 526.) He also noted Hatcher wore a brace on his right knee and had difficulty moving from a sitting to standing position. (*Id.*) Dr. Faust found Hatcher was polite and cooperative with normal affect, mood, speech, attention/concentration, and memory. (Tr. 526-527.) He also noted Hatcher "did not display any problems with irritability, anxiety, or depressed mood." (*Id.*)

8

Dr. Faust assessed (1) alcohol use disorder, severe, no use since April 1, 2013; and (2) cocaine use disorder, moderate, no use since 2012. (Tr. 528.) He summarized his findings as follows:

> The claimant demonstrated no difficulty relating to others during this examination. He was interactive and personable. During the session, Dwayne was polite and cooperative with the examiner, and appeared to be motivated to interact and perform tasks, putting forth good effort on all tasks. Overall, Dwayne answered all questions asked of him and attended to the conversation well. His persistence to tasks was good and work pace was within normal limits. He did not display any symptoms of depression or anxiety and there is no evidence of a psychological diagnosis.
>
> Mr. Hatcher is articulate and he understands all questions and instructions here today, including complex or multi-step instructions. From my clinical observations, review of history, Dwayne is estimated to be functioning within the average range of intelligence. He denied any problems with memory or learning.
>
> In sum, Mr. Hatcher does not present with any diagnosable personality or emotional disorders, but he is diagnosed with alcohol and cocaine use disorders. He reports being sober since 4/1/13 and appears motivated to remain sober, saying that he attends 3 to 4 AA meetings a week.

(Tr. 528-529.) In terms of the four work-related mental abilities, Dr. Faust found Hatcher was "not expected to show limitations" in the areas of understanding, remembering, and carrying out instructions; or maintaining attention and concentration, persistence, and pace to perform tasks and to perform multi-step tasks. (Tr. 529-530.) He further found Hatcher "is seen as able to respond appropriately to supervision and to coworkers in a work setting," and "viewed as able to respond appropriately to work pressures and manage his moods and reactions to stress." (*Id.*)

Shortly thereafter, on December 27, 2013, Hatcher underwent a physical consultative examination with Alan Wine, M.D. (Tr. 533-543.) He "had a multitude of complaints of pain involving both feet, both knees, right ankle, left hip, left shoulder, and back." (Tr. 533.) Hatcher

indicated his pain impeded his ability to "walk, stand, and perform all activities which require ambulation." (*Id.*) He rated his pain an 8 to 10 on a scale of 10. (*Id.*)

On examination, Dr. Wine found antalgic gait with a short stride, but noted Hatcher used no assistive devices, could walk on his heels and toes without difficulty, needed no help changing for the exam or getting on and off the exam table, and was able to rise from his chair without difficulty. (Tr. 535.) He found limited range of motion in Hatcher's shoulders, fingers, dorsolumbar spine, hips, knees, and ankles; reduced muscle strength in his shoulders, elbows, wrists, hips, knees, and feet; tenderness in Hatcher's lumbosacral area; positive straight leg raise bilaterally; and decreased sensation in Hatcher's lower extremities below the knees. (Tr. 535, 539-542.) An x-ray of Hatcher's lumbar spine taken that date showed extensive osteophyte formation, degenerative disc disease at L4-5 and L5-S1, and mild retrolisthesis of L4 on L5. (Tr. 538.) Dr. Wine assessed sciatica, hypertension, and multiple fractures and sprains of extremities. (Tr. 536.) He opined "moderate limitations with standing, walking, climbing stairs, squatting, bending, lifting and carrying." (Tr. 537.)

On October 15, 2015, state agency physician Venkatachala Sreenivas, M.D., reviewed Hatcher's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 172-174.) She found Hatcher could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 2 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday. (*Id.*) Dr. Sreenivas further concluded Hatcher had an unlimited capacity to crouch and could frequently kneel and balance; occasionally stoop, crawl, push/pull, and climb ramps and stairs; and never climb ladders, ropes, or scaffolds. (*Id.*) She

found he had no manipulative limitations. (*Id.*) Finally, Dr. Sreenivas opined Hatcher should avoid all exposure to unprotected heights and heavy machinery. (*Id.*)

On December 14, 2015, state agency physician Maria Congbalay, M.D., reviewed Hatcher's medical records and completed a Physical RFC Assessment. (Tr. 186-188.) She reached the same conclusions as Dr. Sreenivas with the exception that she found Hatcher could only occasionally (as opposed to frequently) balance and crouch and that he was limited to occasional use of foot controls. (*Id.*)

In addition, on October 19, 2015, state agency psychologist Bruce Goldsmith, Ph.D., reviewed Hatcher's medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 170-171.) Dr. Goldsmith concluded "there does not appear to be a severe mental impairment at this time." (Tr. 171.) Several months later, on December 15, 2015, state agency psychologist Katherine Fernandez, Psy.D., reached the same conclusion. (Tr. 184-185.)

### D.    Hearing Testimony

During the April 21, 2017 hearing, Hatcher testified to the following:

- He graduated from high school and attended two years of college. (Tr. 128-129.) He lives in a two family house with his wife. (Tr. 124.) He has a driver's license but his license was suspended in January 2013. (Tr. 126-127.)

- He has not worked since April 2015. (Tr. 130.) Prior to then, he had a variety of manual labor jobs, including janitorial, forklift operation, and dishwashing positions. (Tr. 137-143.) He also worked in various factories as a machine operator. (*Id.*) In these positions, he was primarily on his feet most of the work day and lifted anywhere between 30 and 100 pounds. (*Id.*)

- In addition, between 1996 and 2015, he worked for his father as a tax preparer on a seasonal basis (about 10 weeks per year). (Tr. 134-136.) In this position, he prepared taxes, answered phones, and met with clients. (*Id.*) This job involved some standing but was mostly seated. (*Id.*)

11

- He stopped working because he was in "too much pain all the time." (Tr. 133.) Specifically, he experiences pain in his hip, foot, back, and knees. (Tr. 130, 133, 146.) He also has a disfigured left foot. (Tr. 146.) As a result of his pain, he has difficulty "moving around, carrying stuff, bending over, picking up stuff, [and] moving this and that." (Tr. 130.) Sitting also causes him pain. (Tr. 151.) His pain often prevents him concentrating. (*Id*.)

- His doctor prescribed him a cane in 2014. (Tr. 130-131.) He has used it regularly since then for support. (Tr. 131.) He needs it to walk and stand, and uses it both when he is in his house and when he goes out. (Tr. 130-131.)

- He also takes Meloxicam and has had two hip injections. (Tr. 133.) The injections helped for a couple days but then "it went back to where it was." (Tr. 134.) His doctor has talked with him about seeing a pain management specialist and undergoing physical therapy, but he has not yet done that. (Tr. 146, 153-154.) Now that he has stopped smoking, his doctor wants him to have surgery on his left foot. (Tr. 134, 153-154.)

- He can be on his feet for 30 minutes at one time, and for a total of one hour during an 8 hour workday. (Tr. 150.) He cannot be on his feet for more than 5 minutes without his cane. (*Id*.) He can generally sit for about 20 to 30 minutes before needing to get up. (*Id*.) He can sit for a total of 5 to 6 hours in an 8 hour workday. (Tr. 150-151.) He has good days and bad days. (Tr. 151-152.) On a bad day, he cannot sit still for more than 5 to 10 minutes. (*Id*.) He has bad days two to three times per week. (*Id*.)

- He cannot return to his job as a tax preparer because of his pain. When he worked as a tax preparer in 2015, he would "groan out loud" and make clients uncomfortable. (Tr. 153.) Sometimes he would need to leave client meetings because of his pain. (Tr. 149.) He missed ten days of work due to his pain. (Tr. 153.)

The VE testified Hatcher had past work as a (1) C&C helper (skilled, SVP 6, medium but performed as heavy); (2) honing machine operator (skilled, SVP 5, medium but performed as heavy); (3) drill press operator (semi-skilled, SVP 3, medium); (4) box machine operator (unskilled, SVP 2, light); (5) forklift driver (semi-skilled, SVP 3, medium but performed as both medium and heavy); (6) janitor (unskilled, SVP 2, medium); and (7) tax preparer (semi-skilled, SVP 4, sedentary). (Tr. 148-149.) The ALJ then posed the following hypothetical question:

> I would like for you to consider an individual with the same age, education and past work as Mr. Hatcher, who can perform a range of light exertional work, but with that being subject to the following. This person can lift and/or carry 20 pounds occasionally, and 10 pounds frequently. He can sit for six hours in an eight-hour workday, as well as stand and/or walk for two hours in an eight-hour workday. This person can occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch and crawl. He cannot climb ladders, ropes or scaffolds. This individual can operate foot controls on an occasional basis. He must avoid hazards, such as unprotected heights and moving mechanical machinery, and he cannot perform commercial driving. Could this person perform any of Mr. Hatcher's past work?

(Tr. 156.) The VE testified the hypothetical individual would be able to perform Hatcher's past work as a tax preparer, but would not be able to perform any of his other past work. (Tr. 156-157.)

The ALJ then asked a second hypothetical that was the same as the first with the exception that it limited the individual to lifting and/or carrying ten pounds occasionally and less than ten pounds frequently. (Tr. 157.) The VE testified the hypothetical individual would be able to perform Hatcher's past work as tax preparer, but would not be able to perform any of his other past work. (*Id.*)

The ALJ then asked the VE to "consider the same individual I've been building upon now, and now this person requires the ability to use a cane while ambulating." (*Id.*) The VE testified that, "if it's a single prong cane, it would not change my testimony based on my experience at the sedentary level." (*Id.*) The VE explained, however, that use of a walker would preclude competitive employment. (*Id.*)

The ALJ then asked "[i]f you added into any of these hypotheticals that the individual in question can perform only simple, routine tasks and make simple work-related decisions and

13

relate superficially with others, would that have changed any of your testimony?" (Tr. 158.) The VE testified that this additional limitation would eliminate the tax preparer position. (*Id*.)

Hatcher's attorney then asked the VE to eliminate the requirement for simple, repetitive tasks but add a limitation to superficial contact with the public. (Tr. 159.) The VE testified that the hypothetical individual would be able to perform Hatcher's past work as a tax preparer. (*Id*.) Upon further questioning, the VE stated that, if the individual were limited to occasional superficial contact with the public, the tax preparer position would be eliminated. (Tr. 159-160.)

Finally, the ALJ asked regarding employer tolerance for absenteeism and off-task behavior. (Tr. 158.) The VE testified that "employers generally allow for about 10 to 12 unscheduled absences per year," or one per month. (*Id*.) With regard to off task behavior, the VE testified that "employers on average will allow employees to be off task approximately 15% of the workday outside the regularly scheduled work breaks." (Tr. 158-159.)

## III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Hatcher was insured on his alleged disability onset date, April 30, 2015, and remained insured through March 31, 2016, his date last insured ("DLI.") (Tr. 13.) Therefore, in order to be entitled to POD and DIB, Hatcher must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period

precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988);

*Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on March 31, 2016.

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of April 30, 2015 through his date last insured of March 31, 2016 (20 CFR 404.1571 et seq.).

3.  Through the date last insured, the claimant had the following severe impairments: degenerative disc disease/spondylolisthesis of the thoracic and lumbar spines, degenerative joint disease of the left hip, degenerative joint disease of the left foot with deformity status-post traumatic events, obesity, and tobacco abuse (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526.)

5.  After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform a reduced range of sedentary work with the following nonexertional physical limitations (see generally 20 CFR 404.1567(a)). He could lift, carry, push, and pull 10 pounds occasionally and less than 10 pounds frequently. He could sit for six hours per eight-hour workday and stand and walk for two hours each per an eight-hour workday. He could occasionally climb ramps and stairs. He could occasionally balance, stoop, kneel, crouch, and crawl. He could climb ladders, ropes, or scaffolds. He could operate foot controls on an occasional basis. He must avoid hazards, such as unprotected heights and moving mechanical machinery. He can require the ability to use a cane when standing or walking. He cannot perform commercial driving.

6.  Through the date last insured, the claimant was capable of performing past relevant work as a TAX PREPARER. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity as generally classified and actually performed (20 CFR 404.1565.)

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from April 30, 2015, the alleged onset date, through March 31, 2016, the date last insured (20 CFR 404.1520(f)).

(Tr. 13-24.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another

17

conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

## *RFC & Evaluation of Subjective Complaints*

Hatcher argues the ALJ failed to "fully and fairly evaluate" his complaints of pain in formulating the RFC. (Doc. No. 14 at 10-14.) He maintains the objective medical evidence supports his allegations of disabling pain, including x-rays showing foot deformities, severe hip osteoarthritis, and degenerative disc disease in his lumbar spine. (*Id.*) Hatcher asserts the ALJ failed to acknowledge that conservative treatment methods (including medication, repeat injections, and physical therapy) had failed to resolve his pain. (*Id.*) He also argues the RFC is not supported by substantial evidence because it failed to include limitations that accounted for the fact that his "pain limits his ability to attend and concentrate." (*Id.*) Specifically, Hatcher maintains "he is unable to perform the necessary attention to detail required for the position of tax preparer" and asserts the ALJ should have limited him to unskilled work activity, which would have resulted in a finding of disability under the grid rules. (*Id.*)

The Commissioner argues the ALJ properly evaluated Hatcher's subjective complaints. (Doc. No. 16 at 6-12.) She maintains the ALJ considered multiple factors in assessing Hatcher's allegations of disabling pain, including the objective medical evidence, Hatcher's relatively conservative treatment history, and his noncompliance with his physicians' recommendations. (*Id.*) The Commissioner maintains "the ALJ provided appropriate and sufficient reasons for his assessment of Plaintiff's subjective symptoms, and those reasons were supported by substantial evidence." (*Id.*) She further asserts the ALJ's RFC is supported by substantial evidence, noting there is no record evidence that Hatcher reported concentration problems to any of his physicians. (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2).[4] An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments

---

[4] This regulation has been superseded for claims filed on or after March 27, 2017. As Hatcher's application was filed in August 2015, this Court applies the rules and regulations in effect at that time.

that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, the ALJ found, at step two, that Hatcher suffered from the severe impairments of degenerative disc disease/spondylolisthesis of the thoracic and lumbar spines, degenerative joint disease of the left hip, degenerative joint disease of the left foot with deformity status- post traumatic events, obesity, and tobacco abuse.  (Tr. 15.)  In determining that Hatcher did not meet or equal the requirements of a Listing at step three, the ALJ discussed the medical evidence regarding Hatcher's physical impairments at some length, as follows:

> Based on the current medical record, I find that the claimant sustained an injury to his left foot "thirty years ago" (Ex. 1F,  p. 2). On July 13, 2015, the claimant reported to orthopaedic surgeon John E. Feighan, M.D., that he was not receiving any treatment for his left foot, smoking a half- pack of cigarettes a day, and using a cane to ambulate (Ex. 1F,  p. 2). Based on an X-ray of the claimant's left foot on March 12, 2015, Dr. Feighan determined that the claimant had post- traumatic arthropathy at the first through third tarsometatarsal joints of the left foot (Ex. 1F, pp. 2, 4). Dr. Feighan recommended nonoperative treatment until he quit smoking after which he would recommend a "possible midfoot osteotomy and fusion" (Ex.  1F,  p. 2).

> During the current adjudicating period through March 31, 2016, the claimant did not receive any targeted treatment for his left foot, such as physical therapy or any documented prescriptions for orthopaedic shoes or inserts, but he was using a cane to ambulate (Ex. 4F, pp. 1, 8).

> Significantly, although after the end of the current adjudicating period, the claimant reported to Dr. Feighan on May 22, 2017, and he reported that he "quit smoking at Christmas.  [His] foot pain [was] better with change in shoe wear to softer cushioned arches" (Ex. 17F, p. 2). On examination, Dr. Feighan observed that the claimant had "good strength in all four planes," "good pulses," and intact sensation in the left foot (Ex. 17F, p. 2). Accordingly, Dr. Feighan opined that surgical treatment was not recommended at this time (Ex. 17F, p. 2).

> Additionally, according to an X-ray of the claimant's left hip on October 13, 2015, he was diagnosed with severe degenerative changes (Ex. 12F, p. 1). In addition to his chronic  generalized treatment with NSAIDs, the claimant underwent a steroid injection in his hip on October 21, 2015, but the ameliorative effects of this procedure lasted only "three to four days" (Ex. 12F, p. 2; but see Ex. 4F, p. 6). Since

the claimant's failed response to the steroid injection, Dr. Wagner has maintained the claimant on Meloxicam only for his chronic pain symptoms since February 2016, without any documented "change in pain character/severity" of his left hip pain (Ex. 4F, p. 1). As will be discussed, Dr. Wagner advised the claimant to enter into a formal chronic pain management program in light of his history of substance addiction disorder (in full sustained remission) and due to his access to medical insurance and financial resources, but he testified that he has not done so.

(Tr. 17-18.)  The ALJ also discussed, at this step, the results of Hatcher's December 2013 lumbar spine x-ray and his December 2015 CT showing degenerative changes throughout his thoracolumbar spine.  (Tr. 19.)

At step four, the ALJ first acknowledged Hatcher's allegations that "left hip pain from arthritis, a disfigured left foot, a sprained knee, and right ankle weakness have prevented him from working."  (Tr. 20.)  He found Hatcher's medically determinable impairments could reasonably be expected to cause his alleged symptoms; however, he found Hatcher's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record."  (*Id.*)  The ALJ then considered Dr. Wagner's April 2017 opinion that Hatcher has demonstrated an inability to ambulate effectively and limited ability to maintain his activities of daily living.  (*Id.*)  The ALJ accorded this opinion only "partial weight," finding it was not consistent with Hatcher's conservative treatment and "his ability to manage his symptoms with subtherapeutic treatment modalities."  (Tr. 21.)  The ALJ was also not persuaded by Dr. Wagner's opinion in light of evidence that "he has not followed through on recommendations to undergo formal chronic pain management for his reportedly debilitating pain symptoms even though he has access to medical insurance."  (*Id.*)

The ALJ also accorded "partial weight" to the opinions of Dr. Sreenivas and Congbalay, finding "the claimant's documented left hip pain symptoms, left foot arthropathy, and obesity have imposed more restrictive exertional and nonexertional limitations than the State Agency medical consultants opined." (Tr. 21.) The ALJ limited Hatcher to a reduced range of sedentary work, as follows:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform a reduced range of sedentary work with the following nonexertional physical limitations (see generally 20 CFR 404.1567(a)). He could lift, carry, push, and pull 10 pounds occasionally and less than 10 pounds frequently. He could sit for six hours per eight-hour workday and stand and walk for two hours each per an eight-hour workday. He could occasionally climb ramps and stairs. He could occasionally balance, stoop, kneel, crouch, and crawl. He could climb ladders, ropes, or scaffolds. He could operate foot controls on an occasional basis. He must avoid hazards, such as unprotected heights and moving mechanical machinery. He can require the ability to use a cane when standing or walking. He cannot perform commercial driving.

(Tr. 19.)

For the following reasons, the Court finds the RFC is supported by substantial evidence. The ALJ acknowledged Hatcher's complaints of chronic hip, foot, and back pain, as well as his frequent use of and prescription for a cane. (Tr. 17, 20.) The ALJ also expressly acknowledged objective medical evidence documenting severe osteoarthritis in his hip, degenerative changes in his thoracolumbar spine, and arthropathy and disfigurement in his left foot. (Tr. 17, 19, 20.) Indeed, in light of this evidence, the ALJ imposed significant functional limitations, restricting Hatcher to a reduced range of sedentary work and the use of a cane when standing or walking. (Tr. 19.) However, the ALJ found additional restrictions were not warranted in light of Hatcher's conservative treatment history, non-compliance with physician

recommendations, and normal examination findings.  (Tr. 17, 20-21.)  As discussed below, the ALJ's findings are supported by substantial evidence in the record.

With regard to Hatcher's treatment history, treatment records reflect Hatcher was treated primarily with NSAIDs and non-opiate pain medication during the relevant time period; i.e., between his April 31, 2015 alleged onset date and March 31, 2016 DLI.  (Tr. 425-426, 423, 418-419, 416, 411-412.)  Dr. Wagner first raised the possibility of hip injections in June 2015, but Hatcher declined.  (Tr. 423.)  Hatcher consented to a hip injection four months later in October 2015, and but then declined hip injections during a visit with Dr. Wagner in February 2016.  (Tr. 545, 411-412.)  He did not receive his second hip injection until over a year later (and well after his DLI) in March 2017.  (Tr. 552.)  Moreover, while several treatment records post-dating his DLI suggest Hatcher participated in physical therapy, Hatcher has not directed this Court's attention to any physical therapy treatment notes in the record and, in fact, testified during the hearing that he had not participated in physical therapy.  (Tr. 154.)

As the ALJ acknowledged, several of Hatcher's physicians discussed with him the possibility of surgery on his left foot and/or hip.  Beginning in July 2015, his physicians encouraged him to quit smoking to "improve his status as a surgical candidate."  (Tr. 392, 411-412.)  However, the record reflects Hatcher failed to quit smoking until over a year and a half later (and well after his DLI) in December 2016.  (Tr. 584-585.)  Further, and as the ALJ noted, Hatcher testified at the hearing that his doctor indicated he would need to see a pain management specialist in order to receive prescriptions for stronger pain medication.  (Tr. 146, 153-154.)  Hatcher testified he had not pursued treatment with pain management, despite the

fact he had access to medical insurance.  (Tr. 126, 146, 153-154.)  Hatcher has not offered any

explanation for his failure to pursue his physicians' treatment recommendations.

As the Sixth Circuit has noted, "[i]n the ordinary course, when a claimant alleges pain

so severe as to be disabling, there is a reasonable expectation that a claimant will seek

examination or treatment. A failure to do so may cast doubt on a claimant's assertions of

disabling pain." *Strong v. Soc. Sec. Admin*., 88 Fed. Appx. 841, 846 (6th Cir.2004).  *See also*

*Kelso v. Comm'r of Soc. Sec.,* 2019 WL 1033642 at * 10 (S.D. Ohio March 5, 2019) (noting

that "where there was little evidence suggesting the claimant's financial or mental condition

somehow hindered him from seeking examination or treatment, the failure to seek medical

examination or treatment was properly considered"); *Rowland v. Comm'r of Soc. Sec.,* 2017

WL 1190541 at * 7 (N.D. Ohio March 31, 2017) (finding "the fact that Plaintiff was not

interested in pursuing alternative treatment methods after Dr. Parikh decided against prescribing

opioids weighs in favor of his impairment being non-severe"); *Simpson v. Comm'r of Soc. Sec*.,

2016 WL 74420 at *11 (S.D. Ohio Jan. 6, 2016) (holding that because "[t]he record does not

show that plaintiff followed through on her treating orthopedist's suggestions despite her

complaints of disabling pain" the ALJ was reasonable in discounting Plaintiff's complaints).

Here, the record reflects Hatched declined hip injections on several occasions; failed to

take the necessary steps to permit hip or foot surgery (i.e., stop smoking) until well after his

DLI; and failed to pursue treatment with pain management specialists.  In the absence of any

allegation that Hatcher was unable to pursue treatment recommendations for financial or other

reasons, the Court finds the ALJ properly considered Hatcher's conservative treatment and non-

compliance with treatment recommendations when fashioning the RFC.

Finally, the Court finds substantial evidence supports the ALJ's findings that physical examinations often revealed normal findings. While Hatcher is noted in treatment records as using a cane, physical examination findings during the relevant time period were largely normal. In March and May 2015, Dr. Grady found 5/5 muscle strength and normal range of motion in Hatcher's feet and ankles. (Tr. 393-394.) In July 2015 and May 2017, Dr. Feighan noted "good strength in all 4 planes," good pulses, and intact sensation. (Tr. 392, 584.) Notably, Hatcher does not direct this Court's attention to any abnormal physical examination findings during the time period between his April 13, 2015 alleged onset date and March 31, 2016 DLI. Nor does he direct this Court's attention to any treatment records suggesting he suffered from concentration deficits as a result of his chronic pain. Indeed, Hatcher has not identified (and this Court's own review has not uncovered) any treatment records indicating that he complained of (or was found to have suffered from) poor concentration, persistence, or memory during the relevant time period.[5]

In light of the above, and viewing the decision as a whole,[6] the Court finds Hatcher has failed to demonstrate additional limitations relating to his degenerative disc disease and/or

---

[5] The Court notes that, prior to Hatcher's alleged onset date, consultative examiner Dr. Faust found no evidence of deficits in concentration or persistence and concluded Hatcher was not expected to show limitations in maintaining attention, concentration, persistence, and pace to perform multi-step tasks. (Tr. 529-530.)

[6] The Court notes that the ALJ's primary discussion of the medical evidence occurs at step three, rather than at step four. However, the Court may consider the decision as a whole and finds the ALJ's discussion of the record evidence relating to Hatcher's physical impairments at step three sufficiently explains and clarifies the ALJ's RFC and symptom evaluation findings at step four. *See, e.g., Lecea v. Comm'r of Soc. Sec.*, 2017 WL 941832 at * 9 (E.D. Mich. Feb. 22, 2017).

degenerative joint disease are warranted or otherwise show the RFC is not supported by substantial evidence.

Hatcher nonetheless maintains remand is required because the ALJ failed to properly evaluate his subjective symptoms. When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See e.g, Massey v. Comm'r of Soc. Sec*., 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[7] 2016 WL 1119029 (March 16, 2016).

If the claimant's allegations are not substantiated by the medical record, the ALJ must evaluate the individual's statements based on the entire case record. The evaluation of a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs*., 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent

---

[7]    SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the April 21, 2017 hearing.

reviewer can assess how the adjudicator evaluated the individual's symptoms" SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. Beyond medical evidence, there are seven factors that the ALJ should consider.[8] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, substantial evidence supports the ALJ's evaluation of Hatcher's subjective symptoms. Viewing the decision as a whole, it is clear the ALJ considered a number of the factors identified in SSR 16-3p. As discussed above, the ALJ considered the location, duration and frequency of Hatcher's chronic hip, foot, and back pain, and expressly discussed the types and effectiveness of the medications prescribed to Hatcher to alleviate his pain. (Tr. 17, 20-21.) The ALJ also discussed other treatment that Hatcher received (such as hip injections) as well as the effectiveness of that treatment. (*Id*.) The ALJ, however, found Hatcher's statements

---

[8]    The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7.

concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence" in light of his conservative treatment, noncompliance with treatment recommendations, and generally normal physical examination findings.

These reasons are supported by substantial evidence for the reasons set forth *supra*. Specifically, and as noted above, treatment records indicate Hatcher was treated primarily with NSAIDs and non-opiate pain medications during the relevant time period, as well as with hip injections in October 2015 and March 2017. (Tr. 425-426, 423, 418-419, 416, 411-412, 545, 552.) Physical examination findings were largely normal during the relevant time period (including normal muscle strength, range of motion, sensation, and pulses) and there is no indication in any treatment records of concentration or persistence deficits. Lastly, while his treatment providers repeatedly advised him he would not be a viable candidate for either foot or hip surgery until he stopped smoking, Hatcher did not stop smoking until December 2016, well after his March 31, 2016 DLI. (Tr. 392, 411-412, 584-585.) Moreover, Hatcher did not pursue treatment with pain management, despite being advised by Dr. Wagner that he would need to do so in order to obtain stronger pain medication. (Tr. 146, 153-154.) Notably, Hatcher has not alleged he was unable to pursue treatment recommendations for financial or other reasons.

Under the circumstances presented, it was reasonable for the ALJ to discount Hatcher's subjective complaints in formulating the RFC. *See e.g., Kepke v. Soc. Sec. Admin.*, 636 Fed. Appx. 625, 638-639 (6th Cir. Jan. 12, 2016) (finding the ALJ reasonably found Plaintiff's credibility was damaged based on her "routine and/or conservative treatment for the allegedly disabling impairments"); *McKenzie v. Comm'r of Soc. Sec.*, 2000 WL 687680 at *4 (6th Cir. May 19, 2000) ("Plaintiff's complaints of disabling pain are undermined by his non

aggressive treatment."); *Simpson*, 2016 WL 74420 at *11 (holding that because "[t]he record does not show that plaintiff followed through on her treating orthopedist's suggestions despite her complaints of disabling pain" the ALJ was reasonable in discounting Plaintiff's complaints).

While Hatcher urges the Court to find that the reasons given by the ALJ do not demonstrate a lack of credibility, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment

for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.") The ALJ provided sufficiently specific reasons for his evaluation of Hatcher's subjective symptoms and supported those reasons with reference to specific evidence in the record. Hatcher's argument to the contrary is without merit.

Accordingly, and for all the reasons set forth above, Hatcher's first assignment of error is without merit.

### Treating Physician Dr. Wagner

Lastly, Hatcher argues, summarily, that the ALJ failed to properly evaluate the April 2017 opinion of Dr. Wagner. (Doc. No. 14 at 12-13.) Specifically, Hatcher asserts it was improper for the ALJ to reject Dr. Wagner's opinion on the ground it was inconsistent with

Hatcher's conservative treatment, arguing "conservative treatment does not diminish the pain he was experiencing." (*Id*. at 13.)

The Commissioner argues the ALJ reasonably evaluated Dr. Wagner's opinion. (Doc. No. 16 at 10.) She maintains Hatcher "fails to show how Dr. Wagner's opinion undermines the RFC as the ALJ limited Plaintiff to sedentary work and allowed for the use of a cane." (*Id*.) The Commissioner asserts that, other than the use of a cane, Dr. Wagner offers no specific functional restrictions and, therefore, the ALJ was not required to afford his opinion controlling, or even great, weight. (*Id*.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[9] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[10] Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all

_____

[9] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017). As Hatcher's application was filed in August 2015, this Court applies the rules and regulations in effect at that time.

[10] SSR 96-2p has been rescinded. This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298 at *1.

of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[11]  *See*

*also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion

controlling weight, then the opinion is weighed based on the length, frequency, nature, and

extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the

degree to which the opinion is consistent with the record as a whole and is supported by

relevant evidence, *id.* § 404.1527(c)(2)-(6).")

  If the ALJ determines a treating source opinion is not entitled to controlling weight,

"the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are

'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave

to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of*

*Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5).  *See*

*also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a

sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,'

particularly where a claimant knows that his physician has deemed him disabled and therefore

'might be bewildered when told by an administrative bureaucracy that she is not, unless some

reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378

F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the

---

[11] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *See Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

On April 21, 2017, Dr. Wagner authored a letter regarding Hatcher's "current health and level of impairment." (Tr. 554-555.) Dr. Wagner indicated Hatcher had a past medical

history of osteoarthritis of the left hip and lumbar spine, traumatic arthropathy of the left foot, obesity, hyperlipidemia, and prediabetes. (*Id.*) He recounted the results of previous imaging studies of Hatcher's hip, foot and spine, and stated as follows:

> Mr. Hatcher has demonstrated an inability to ambulate effectively secondary to pain from his osteoarthritis (multiple sites) and traumatic arthropathy of left foot. This has persisted greater than 12 months and is expected to remain permanent with future intermittent exacerbations. Mr. Hatcher requires the assistance of a cane. His current level of impairment limits his ability to maintain his individual [activities of daily living].
>
> * * *
>
> On exam, Mr. Hatcher has demonstrated a persistent antalgic gait. He has restricted range of motion in his lumbar spine, left hip, and left foot. There is generalized weakness of the left lower extremity (4/5) compared to right lower extremity. Mr. Hatcher has participated in physical therapy and repeat intra-articular injections with limited improvement. To date, Mr. Hatcher has maintained all recommended interventions and follow up plans.

(*Id.*)

The ALJ accorded "partial weight" to Dr. Wagner's opinion, explaining as follows:

> I give partial weight, and not controlling weight, to Dr. Wagner's opinion to the extent that his itemization of the claimant's medical impairments are consistent with his treatment notes and radiological evidence (Ex. 13F; see generally Exs. 4F; 12F). On the other hand, I find that the functional severity that he describes is not consistent with the claimant's conservative treatment that he has received and his ability to manage his symptoms with subtherapeutic treatment modalities (due in part to his history of polysubstance addiction and his ongoing tobacco abuse) in between visits through March 31, 2016 (Exs. 1F; 4F). The claimant testified that the only pain medication that he was taking was Meloxicam and he denied taking any additional over-the- counter pain medications (see, e.g., Ex. 4F, p. 1). Additionally, I am not persuaded by Dr. Wagner's opinion because I note that that the claimant testified that he has not followed through on recommendations to undergo formal chronic pain management for his reportedly debilitating pain symptoms even though he has access to medical insurance. Accordingly, I give partial weight to Dr. Wagner's opinion to the extent that the claimant's documented longitudinal use of a cane for his conservatively-treated effects of his severe physical impairments have restricted him to a reduced range of sedentary work to the extent that I have described in this finding (Ex. 13F; but see Exs. 1F; 4F; see also Ex. 1 7F, p. 2).

(Tr. 21.)

The Court finds the ALJ properly evaluated Dr. Wagner's April 2017 opinion. The ALJ expressly acknowledged Dr. Wagner's opinion and, in fact, adopted his conclusion that Hatcher required the use of cane when walking and standing. (Tr. 19, 21.) However, the ALJ rejected Dr. Wagner's opinion to the extent it was inconsistent with the RFC on the grounds that it was inconsistent with Hatcher's (1) conservative treatment; (2) "ability to manage his symptoms with subtherapeutic treatment;" and (3) failure to "follow through on recommendations to undergo formal chronic pain management for his reportedly debilitating pain symptoms even though he has access to medical insurance." (Tr. 21.)

The ALJ's reasons constitute "good reasons" for purposes of social security regulations and, further, are supported by substantial evidence. As discussed at length *supra*, treatment records indicate Hatcher was treated primarily with NSAIDs and non-opiate pain medications, as well as with hip injections in October 2015 and March 2017. (Tr. 425-426, 423, 418-419, 416, 411-412, 545, 552.) Physical examination findings were largely normal during the relevant time period (including normal muscle strength, range of motion, sensation, and pulses) and there is no indication in any treatment records of concentration or persistence deficits. Lastly, while his treatment providers repeatedly advised him he would not be a viable candidate for surgery until he stopped smoking, Hatcher did not stop smoking until December 2016, well after his March 2016 DLI. (Tr. 392, 411-412, 584-585.) Moreover, Hatcher did not pursue treatment with pain management, despite being advised by Dr. Wagner that he would need to do so in order to obtain stronger pain medication. (Tr. 146, 153-154.) As noted *supra*,

Hatcher has not alleged he was unable to pursue treatment recommendations for financial or other reasons.

In light of the above, the Court finds the ALJ properly evaluated Dr. Wagner's April 2017 opinion. *See Hogston v. Comm'r of Soc. Sec.*, 2016 WL 9447154 at * 6 (6th Cir. Dec. 29, 2016) (finding evidence of a claimant's "limited and conservative treatment" constitutes a "good reason" for discounting treating physician opinion); *Lester v. Social Sec. Admin.*, 596 Fed. Appx. 387, 389 (6th Cir. Jan. 7, 2015) (finding ALJ reasonably discounted treating physician opinion where it was inconsistent with claimant's conservative treatment); *Derocher v. Comm'r of Soc. Sec.*, 2018 WL 4496529 at * 8 (E. D. Mich. Aug. 31, 2018).

Accordingly, and for all the reasons set forth above, this assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**


 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 27, 2019